**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ROXANNE GARCIA, individually and on behalf of all others similarly situated,<br><br>             Plaintiff,<br><br>v.<br><br>NABFLY, INC., d/b/a BESPOKE POST,<br><br>             Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Roxanne Garcia ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant nabfly, Inc., d/b/a Bespoke Post ("Bespoke Post" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## INTRODUCTION

1.  This is a putative class action lawsuit against Defendant for engaging in an illegal "automatic renewal" scheme with respect to its subscription plans for Bespoke Post-branded products and services that are available exclusively to consumers who enroll in Defendant's auto-renewal membership program (the "Bespoke Post Subscription," described below) through its website at https://www.bespokepost.com (the "Bespoke Post Website") or its mobile applications (the "Bespoke Post Apps") (together with the Bespoke Post Website, the "Bespoke Post Platform"). Defendant is an American corporation that manufactures and distributes subscription boxes containing a curated selection of products – including, among other things, cocktail kits, shave sets, and coffee products[1] – that are delivered on a monthly basis. Relevant

---

[1] Specifically, the Bespoke Post Subscription Box typically includes, *inter alia*, any of the

to Plaintiff's allegations, when consumers sign up for the Bespoke Post Subscription, Defendant actually enrolls consumers in a program that automatically renews the Bespoke Post Subscription from month-to-month and results in monthly charges to the consumer's credit card, debit card, or third-party payment account ("Payment Method").  In doing so, Defendant fails to provide the requisite disclosures and authorizations required to be made to California consumers under California's Automatic Renewal Law ("ARL"), Cal. Bus. Prof. Code §§ 17600, *et seq.*

2.      Through the Bespoke Post Platform, Defendant markets, advertises, and sells to consumers in California and throughout the United States paid memberships to the Bespoke Post Subscription, which automatically renew on a monthly basis and provide consumers with regular shipments of various niche and lifestyle goods and products, in addition to exclusive access to other benefits, services, and features that are only available to paid subscribers (the "Bespoke Post Subscription").

3.      Consumers can sign up for Defendant's Bespoke Post Subscription through either the Bespoke Post Website or the Bespoke Post Apps (collectively, the "Bespoke Post Platform"). To do so, customers provide Defendant with their billing information, and Defendant then automatically charges its customers' Payment Method as payments are due on a monthly basis. Defendant is then able to unilaterally charge its customers renewal fees without their consent, as it is in possession of its customers' Payment Information.  Thus, Defendant has made the deliberate decision to charge Plaintiff and other similarly situated customers on a monthly basis, absent their consent under the ARL, relying on consumer confusion and inertia to retain customers, combat consumer churn, and bolster its revenues.

---

following: barware and mixology products; home décor and lifestyle accessories; men's clothing, shoes, and style accessories; pipes, cigars, and tobacco products; kitchenware, cooking tools, and food items; shaving supplies; camping supplies, outdoor knives, and weatherproof apparel; bags and travel accessories; and music and tech gear.

4.      Pursuant to the ARL, online retailers who offer automatically renewing subscriptions to California consumers must: (i) provide the complete automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent prior to the purchase, *see* Cal. Bus. Prof. Code § 17602(a)(1); (ii) obtain consumers' affirmative consent prior to charging their Payment Methods in connection with the subscriptions, *see id*. § 17602(a)(2); and (iii) provide an acknowledgment that includes the automatic renewal offer terms and identifies a cost-effective, timely, and easy-to-use mechanism for consumers to cancel their subscriptions, *see id*. §§ 17602(a)(3), 17602(c).

5.      Consumers purchasing the Bespoke Post Subscription may do so by choosing a free trial that automatically renews with a paid subscription at the end of the trial period, or a paid monthly subscription (at either the full standard recurring rate that Defendant ordinarily charges or at a promotional or discounted rate that remains static for a limited period of time and then automatically renews to the full standard rate). As will be discussed below, the enrollment process for a Bespoke Post Subscription on the Bespoke Post Platform uniformly violates each of the core requirements of the ARL. Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Bespoke Post Subscription.

6.      Specifically, Defendant systematically violates the ARL by: (i) failing to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement is fulfilled, in violation of Section 17602(a)(1); (ii) charging consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Section 17602(a)(2); and (iii) failing to provide an acknowledgment that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in direct violation of

Section 17602(a)(3).  The acknowledgment also fails to disclose a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation, and in fact Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Bespoke Post Subscription, in violation of Section 17602(c).

7.      As a result, pursuant to Section 17603, all goods, wares, merchandise, or products sent to Plaintiff and the Class under the automatic renewal of continuous service agreements are deemed to be "unconditional gifts" under the ARL.

8.      For the foregoing reasons, Plaintiff brings this action individually and on behalf of all California purchasers of Defendant's Bespoke Post Subscription from the Bespoke Post Platform who, within the applicable statute of limitations period up to and including the date of judgment in this action, incurred unauthorized fees for the renewal of their Bespoke Post Subscription.  Based on Defendant's unlawful conduct, Plaintiff seeks damages, restitution, declaratory relief, injunctive relief, and reasonable attorneys' fees and costs, for: (1) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (2) conversion; (3) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.; (4) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (5) unjust enrichment / restitution; (6) negligent misrepresentation; and (7) fraud.

## THE PARTIES

9.      Plaintiff Roxanne Garcia is a citizen of California, residing in Long Beach, California.

10.     Defendant nabfly, Inc., d/b/a Bespoke Post ("Bespoke Post" or "Defendant") is a Delaware corporation with its corporate headquarters and principal place of business at 151 W 25th St, Fl. 5, New York, New York 10001.  Bespoke Post is a lifestyle and commerce company

that curates monthly boxes of products which consumers pay for with a monthly fee.  Relevant

here, Defendant also offers access to certain exclusive Bespoke Post-branded content, products,

and/or services on a contract or fee basis to customers who enroll in the automatically renewing

Bespoke Post Subscription.  Defendant wholly owns and operates the Bespoke Post Subscription,

which it markets to consumers through the Bespoke Post Platform.  Defendant is also responsible

for the promotion, advertisement, marketing, and/or sale of the Bespoke Post Subscription

program, and it owns and operates the Bespoke Post Website and Apps, through which

Defendant markets and sells the Bespoke Post Subscription.  Defendant sells – and, at all

relevant times during the Class Period, sold – the Bespoke Post Subscription in California and

has done business in and throughout California and the United States.  In connection with the

Bespoke Post Subscription, Defendant has, at all relevant times, made (and continues to make)

automatic renewal or continuous service offers to consumers in California and throughout the

United States via the Bespoke Post Website and/or Bespoke Post Apps.

11.     Plaintiff reserves the right to amend this Complaint to add different or additional

defendants, including without limitation any officer, director, employee, supplier, or distributor

of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and

deceptive conduct alleged herein.

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A),

as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class

action where the aggregate claims of all members of the proposed class are in excess of

$5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class,

and Plaintiff, as well as most members of the proposed class, is a citizen of a state different from

Defendant.

13.     This Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of the Court, and because Defendant maintains its principal place of business in New York.

14.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.  Also, Defendant's principal place of business is located in this District.

## FACTUAL BACKGROUND

### A.     Background On The Subscription Box Industry

15.     The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[2] Subscription e-commerce services now target a wide range of customers and cater to a variety of specific interests.  Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years.  Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[3]  Analysts at UBS predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[4]  That

---

[2] Core DNA, *How to Run an eCommerce Subscription Service: The Ultimate Guide* (May 19, 2020), https://www.coredna.com/blogs/ecommerce-subscription-services.

[3] Business Insider, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it* (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[4] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html ("[A]t close to USD 650 billion in 2020, we expect the subscription economy to expand into a USD 1.5 trillion market by 2025, implying an average annual growth rate of 18%.").  *See also* Subscribed, *UBS Declares: It's Worth Investing in the Subscription Economy* (Apr. 17, 2021), https://www.subscribed.com/read/news-and-editorial/ubs-declares-its-worth-investing-in-the-subscription-economy; Business 2 Community, *The Subscription Economy Is Booming Right Now. But Are You Reaping the Full Benefits?* (Oct. 7, 2021), https://www.business2community.com/ecommerce/the-subscription-economy-is-booming-right-now-but-are-you-reaping-the-full-benefits-02434851.

constitutes an average annual growth rate of 18%, which makes the subscription economy "one

of the fastest-growing industries globally."[5]

16.     Defendant has been riding this wave.  Founded in 2011, Bespoke Post now has

over 300,000 monthly subscribers, and saw revenue increase by 85% between 2020 and 2021.

17.     The production, sale, and distribution of subscription-based products and services

is a booming industry that has exploded in popularity over the past few years.  According to

*Forbes*, "[t]he subscription e-commerce market has grown by more than 100% percent a year

over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up

from $57.0M in 2011."[6]  Following 2016, market growth within the industry increased

exponentially, reaching $650 billion in 2020.[7]  "As such, the financials of companies with

subscription business models[] … improved dramatically in 2020 thanks to limited revenue

volatility and strong cash flow generation."[8]  Thus, "[t]he share prices of most subscription

companies have performed well in recent years."[9]

18.     The expansion of the subscription e-commerce market shows no signs of slowing.

"We're now in the subscriptions era, and the pandemic is accelerating its takeover.  During the

COVID-19 lockdowns, many digital-based subscription business models fared well due to their

---

[5] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra* ("[Growth] was seen across
many areas, including e-commerce, video streaming, gaming, cloud-based applications, etc.");
*see also* Juniper Research, *Subscriptions For Physical Goods To Overtake Digital Subscriptions
By 2025; Growing To Over $263bn Globally* (Oct. 12, 2020),
https://www.juniperresearch.com/press/subscriptions-for-physical-goods-to-overtake
(acknowledging "the significant lead the digital sector has had in th[e] area[ of digital service
subscriptions]").

[6] Forbes, *The State Of The Subscription Economy, 2018* (Mar. 4, 2018),
https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-
2018/#6ad8251a53ef.

[7] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021),
https://www.ubs.com/global/en/wealth-management/our-
approach/marketnews/article.1525238.html.

[8] *Id*.

[9] *Id*.

---

promise of convenience and strong business continuity."[10]  According to *The Washington Post*, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] … The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[11]

19.    However, as the *Washington Post* has noted, there are downsides associated with the subscription-based business model.[12]  While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[13]  In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[14]  Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[15]  As these companies have realized, "[t]he real

---

[10] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

[11] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth").

[12] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[13] McKinsey & Company, *Thinking inside the subscription box: New research on e-commerce consumers* (Feb. 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[14] *Id.*

[15] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014),

---

money is in the inertia."[16]  As a result, "[m]any e-commerce sites work with third-party vendors

to implement more manipulative designs."[17]  That is, to facilitate consumer inertia, a number of

subscription e-commerce companies, including Defendant, "are now taking advantage of

subscriptions in order to trick users into signing up for expensive and recurring plans.  They do

this by [among other things] intentionally confusing users with their [website or] app's design

and flow, by making promises of 'free trials' that convert after only a matter of days, and other

misleading tactics," such as failure to fully disclose the terms of its automatic-renewal

programs.[18]

20.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest

complaints consumers have about brand/retailers is that it's often difficult to discontinue a

subscription marketing plan."[19]  Moreover, "the rapid growth of subscriptions has created a host

of challenges for the economy, far outpacing the government's ability to scrutinize aggressive

marketing practices and ensure that consumers are being treated fairly, consumer advocates

say."[20]  Thus, although "Federal Trade Commission regulators are looking at ways to make it

harder for companies to trap consumers into monthly subscriptions that drain their bank

---

https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[16] *Id.*

[17] Business Insider, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want* (Jun. 25, 2019), https://www.businessinsider.com/dark-patterns-online-shopping-princeton-2019-6.

[18] TechCrunch, *Sneaky subscriptions are plaguing the App Store* (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[19] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* New Media and Marketing, *The problem with subscription marketing* (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.

[20] *Id.*

---

accounts[ and] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[21] widespread utilization of these misleading dark patterns and deliberate omissions persist.

21.     Defendant has successfully implemented these tactics.  Indeed, Defendant's recent growth in revenues and subscriber count with respect to its Bespoke Post Subscription coincides with a sharp decline in subscriber satisfaction, as the Bespoke Post Subscription and the Platform from which they operate have become riddled with "dark patterns."  A dark pattern is "a user interface carefully crafted to trick users into doing things they might not otherwise do, such as … signing up for recurring bills."[22]  Specifically, Defendant has been using various types of dark patterns, including but not limited to "roach motel,"[23] "misdirection,"[24] and "forced continuity,"[25] in order to prevent users from leaving the Bespoke Post Subscription by adopting complex cancellation procedures to increase the friction in the subscription cancellation process. Defendant's utilization of these dark patterns – especially in conjunction with its failure to fully disclose the terms of its automatic-renewal programs (discussed further below) – has led to a reduction in churn rates by making it next to impossible for subscribers to cancel their Bespoke

---

[21] *Id*.

[22] *Dark patterns in UX: how designers should be responsible for their actions* (Apr. 15, 2018), https://uxdesign.cc/dark-patterns-in-ux-design-7009a83b233c (quoting UX designer Harry Brignull (PhD Cognitive Science), who coined the term "Dark Patters" in August 2010).

[23] "Roach motel" refers to a "design [that] makes it very easy for [consumers] to get into a certain situation, but then makes it hard for [consumers] to get out of it (e.g. a subscription)." https://www.darkpatterns.org/types-of-dark-pattern/roach-motel.

[24] "Misdirection" is a type of dark pattern where a website's "design purposefully focuses [customers'] attention on one thing in order to distract [them] attention from another."  In many cases, "[w]hat's deceptive is the way [the website] presents [purchase] options: it uses misdirection to hide what is actually happening[.]"  https://www.darkpatterns.org/types-of-dark-pattern/misdirection.

[25] One example of "forced continuity," another type of dark pattern, is where customers' sign up for a "free trial with a service[ that] comes to an end and [their] credit card silently starts getting charged without any warning.  [The subscriber is] are then not given an easy way to cancel the automatic renewal."  https://www.darkpatterns.org/types-of-dark-pattern/forced-continuity.

Post Subscription.  It has further led to an increase in accidental or unintentional sign-ups by consumers for paid Bespoke Post Subscription plans, in effect increasing subscriber count and, thus, Defendant's overall revenues from renewal fees.

**B.    California's Automatic Renewal Law**

22.    In 2010, the California Legislature enacted the Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq*., with the intent to "end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."  Cal. Bus. & Prof. Code § 17600 (statement of legislative intent).  More recently, in 2018, California's Senate Bill 313 amended Section 17602 of the ARL, adding new requirements meant to increase consumer protections for, among other things, orders that contain free trial and promotional pricing, and subscription agreements entered into online.

23.    The ARL makes it "unlawful for any business making an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

(1) Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity, or in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer.  If the offer also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial.

(2) Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time.

(3) Fail to provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer.  If the automatic

renewal offer or continuous service offer includes a free gift or
trial, the business shall also disclose in the acknowledgment how
to cancel, and allow the consumer to cancel, the automatic renewal
or continuous service before the consumer pays for the goods or
services.

Cal. Bus. & Prof. Code § 17602(a)(1)-(3).

24.     Section 17602(c) of the ARL further provides:

A business that makes an automatic renewal offer or continuous
service offer shall provide a toll-free telephone number, electronic
mail address, a postal address if the seller directly bills the
consumer, or it shall provide another cost-effective, timely, and
easy-to-use mechanism for cancellation that shall be described in
the acknowledgment specified in paragraph (3) of subdivision (a).

Cal. Bus. & Prof. Code § 17602(c).

25.     Additionally, following the 2018 and 2022 amendments to the ARL, the updated

law requires e-commerce sellers, doing business in California, to allow online cancellation of

auto-renewing memberships or recurring purchases that were initiated online.  Specifically,

Section 17602(d) provides:

[A] business that allows a consumer to accept an automatic
renewal or continuous service offer online shall allow a consumer
to terminate the automatic renewal or continuous service
***exclusively online***, ***at will***, ***and without engaging any further
steps that obstruct or delay the consumer's ability to terminate
the automatic renewal or continuous service immediately***.

Cal. Bus. & Prof. Code § 17602(d)(1) (emphasis added).  The updated ARL also requires a seller

who provides an automatic offer that includes a free gift, trial, or promotional pricing to notify

consumers about how to cancel the auto-renewal before they are charged.  Sellers must also

explain the price to be charged when the promotion or free trial ends.  If the initial offer is at a

promotional price that is only for a limited time and will increase later, the seller must obtain

consumer consent to the non-discounted price prior to billing.

26.     Section 17601(a) of the ARL defines the term "Automatic renewal" as a "plan or

arrangement in which a paid subscription or purchasing agreement is automatically renewed at

the end of a definite term for a subsequent term."  Cal. Bus. & Prof. Code § 17601(a).

27.     Section 17601(b) of the ARL defines the term "Automatic renewal offer terms" as "the following clear and conspicuous disclosures: (1) That the subscription or purchasing agreement will continue until the consumer cancels.  (2) The description of the cancellation policy that applies to the offer.  (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known.  (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer.  (5) The minimum purchase obligation, if any."  Cal. Bus. & Prof. Code § 17601(b).

28.     Pursuant to Section 17601(c) of the ARL, "clear and conspicuous" or "clearly and conspicuously" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbol ls or other marks, in a manner that clearly calls attention to the language."  Cal. Bus. & Prof. Code § 17601(c).

29.     Finally, Section 17603 of the ARL provides that where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent[,]" the material sent will be deemed "an unconditional gift to the consumer, who may use or dispose of the same in any manner he or she sees fit without any obligation whatsoever on the consumer's part to the business[.]"  Cal. Bus. & Prof. Code § 17603.

30.     As alleged below, Defendant's practices on the Bespoke Post Platform systematically violate Sections 17602(a)(l), 17602(a)(2), 17602(a)(3), and 17602(c) of the ARL.

**C.**     **Defendant's Business: The Bespoke Post Subscription Enrollment Process**

31.     At all relevant times, Defendant offered, via the Bespoke Post Website and Apps, the Bespoke Post Subscription for access to exclusive Bespoke Post-branded content, products, and/or services on a contract or fee basis.  The Bespoke Post Subscription is offered on a recurring basis for monthly renewal terms, and the plan automatically renews at the end of the defined renewal term unless the subscriber cancels.  For example, customers that sign up for a straight-to-paid monthly Bespoke Post Subscription are, at the end of the initial one-month period, automatically renewed and typically charged the full amount for the next month, and every month thereafter if they do not cancel.  Customers can also sign up for Bespoke Post Subscription boxes on a free trial basis for a limited period of time, in which case, at the end of the initial trial period, their subscriptions are converted to paid monthly subscriptions and their Payment Methods are automatically charged the full monthly renewal rate associated with the subscription plan for the next month, and every month thereafter if they do not cancel.  Defendant's Bespoke Post Subscription constitute automatic renewal and/or continuous service plans or arrangements for the purposes of the ARL.  *See* Cal. Bus. & Prof. Code § 17601.

32.     Consumers can sign up for Defendant's Bespoke Post Subscription through the Bespoke Post Website or the Bespoke Post App (collectively, the "Bespoke Post Platform"). Customers who purchase a Bespoke Post Subscription via the Bespoke Post Platform are automatically enrolled by Defendant in their chosen Bespoke Post Subscription program going forward, by default.  In addition, customers may sign up for the Bespoke Post Subscription on a free-trial basis for a limited time.  Nevertheless, customers that enroll in a free trial, like those that sign up for a paid subscription, must provide Defendant their payment information at the time of enrollment.  Customers' free trial subscriptions automatically convert to paid monthly subscriptions at the end of the trial period, at which point those users are also automatically

enrolled by Defendant in their chosen Bespoke Post Subscription program, and as such their Payment Methods are automatically charged by Defendant on a recurring monthly basis in the amount of the full, promotional, or discounted rate associated with that program, continuing indefinitely until the customer takes affirmative steps to cancel.

33.    The enrollment process for each Bespoke Post Subscription is substantially the same, regardless of the medium used.  For instance, after selecting the Bespoke Post Subscription, those navigating the enrollment process on the Bespoke Post Website are directed to a final webpage (the "Checkout Page"), where prospective subscribers are prompted to input their payment information and then invited to complete their purchase.  For the purposes of the ARL and this Complaint, the "relevant portion of the Checkout Page" refers to the text of that portion of the Checkout Page that appears "in visual proximity to the request for consent to the offer," which in this case pertains to text immediately above the final grey button at the bottom of the Checkout Page that customers must click in order to complete the checkout process.

34.    By way of example, when a consumer signs up for a free trial of the Bespoke Post box, the "relevant portion of the Checkout Page" refers to the disclosures in the block of text immediately above the grey "JOIN THE CLUB" checkout button, *i.e.*, the "request for consent" (red box added for emphasis):



35.     Regardless of how the consumer subscribes (via the Bespoke Post Website or the Apps), Defendant fails to disclose any of the terms of its auto-renewal programs either before or after checkout, and it never requires the individual consumer to read or affirmatively agree to the omitted before consumers complete the checkout process and submit their orders for their Bespoke Post Subscriptions.  Consequently, Defendant uniformly fails to obtain any form of consent from – or even provide effective notice to – their subscribers before charging consumers' Payment Methods on a recurring basis.

**D.     Defendant Violates California's Automatic Renewal Law**

36.     At all relevant times, Defendant failed to comply with the ARL in three ways: (i) Defendant failed to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement was fulfilled, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (ii) Defendant charged Plaintiff's and Class members' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (iii) Defendant failed to provide an acknowledgment that included the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code § 17602(a)(3).  Defendant also fails to provide an acknowledgment that discloses a toll-free telephone number or describes another cost-effective, timely, and easy-to-use mechanism for cancellation, and in fact Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Bespoke Post Subscriptions, in violation of Cal. Bus. & Prof. Code § 17602(c).

     i.     **Defendant Fails To Clearly And Conspicuously Present The Bespoke Post Terms Before The Subscription Agreement Is Fulfilled And In Visual Proximity To The Request For Consent To The Offer.**

37.     First, the Checkout Page for the Bespoke Post Subscription does not present the complete "automatic renewal offer terms[,]" as defined by Cal. Bus. & Prof. Code § 17601(b), in violation of Section 17602(a)(1) of the ARL.  Specifically, using the pictured Checkout Page above as an example, the Checkout Page does not clearly and conspicuously disclose that "the subscription or purchasing agreement will continue until the consumer cancels."  Cal. Bus. & Prof. Code § 17601(b)(1).  For instance, although the relevant portion of the pictured Checkout Page states that "[y]our membership continues until you cancel," this information is presented in basic, unbolded black type without any emphasis, and it is provided in text of the same type face or font, color, and size as the other text of the Checkout Page.  Further, it is presented alongside – and thus, rendered even more inconspicuous by – other, unrelated disclosures providing information not required by the ARL.  It is not presented in contrasting font or color to the surrounding text, and it is not set off from the surrounding text by any symbols, marks, graphics, or any other distinguishing factors that clearly call attention to the language.  In other words, the disclosure was presented in such a way that it could be, and was, easily overlooked, and is therefore not "clear and conspicuous" as defined by the ARL, *see id*. § 17601(c).  As such, with respect to the Bespoke Post Subscription, Defendant fails to disclose "[t]hat the subscription or purchasing agreement will continue until the consumer cancels," *id*. § 17601(b)(1), in the manner required by statute.  *See id*. § 17602(a)(1).

38.     Defendant also fails to present a complete "description of the cancellation policy that applies to the offer[,]" *see* Cal. Bus. & Prof. Code § 17601(b)(2).  For instance, Defendant does not specify anywhere on the Checkout Page that, in the case of a free trial subscription, consumers "must cancel the trial service from Bespoke Post before the end of the trial period in

order to avoid becoming a paid subscriber and being charged for that paid Subscription service," as is disclosed elsewhere on Defendant's website.[26]  Nor does it mention that straight-to-paid subscribers must cancel in accordance with Defendant's "deadline to opt out of receiving [the Bespoke Post] Subscription for any given month," which "is typically on or around the fifth day of the month," as is set forth on other pages of Defendant's website.[27]  Additionally, the Checkout Page fails to state that "the effective date of cancellation of your Subscription will be the first day of the month after you submit your cancellation request, regardless of the date of the current month in which you submit such request,"[28] or that "you will still receive a subscription for [the month in which you submit the cancellation request], unless you also opt out of [that month's Subscription]," as do terms set forth on other pages of Defendant's website.[29]  Nor does the Checkout Page provide any contact method that the consumer can use to reach out and affect cancellation, such as a toll-free phone number or an email address, or any information whatsoever regarding *how* to cancel.[30]  The Checkout Page also fails to place subscribers on

---

[26] Bespoke Post Terms of Use, *available at* https://www.bespokepost.com/terms (effective Sep. 29, 2020; last visited Feb. 2, 2023).

[27] *Id*.

[28] *Id*. ("CANCELLATION OF YOUR SUBSCRIPTION WILL NOT AFFECT CHARGES INCURRED PRIOR TO THE EFFECTIVE DATE OF CANCELLATION DATE."); *see also id.* ("Your cancellation will be effective as of the first day of the month following the date you submitted your cancellation request.  After your cancellation request, you will still be charged for any shipments that you have not opted out of receiving prior to the effective date of your cancellation.").

[29] *Id*. ("As an illustration, if you submit a cancellation request on January 1, your cancellation will be effective on February 1, and you will still receive a Subscription for January, unless you also request to opt out of your January Subscription at the time you cancel.  However, if you submit a cancellation request on January 10, your cancellation will be effective on February 1 and you will still receive a Subscription for January, since the opt out date for January has passed.  Each month, you will be charged when the Subscription is shipped or sometime thereafter, unless you opt out of receiving the Subscription for the given month in accordance with the Terms of Service.").

[30] *See id*. ("YOU MAY CANCEL YOUR SUBSCRIPTION BY LOGGING IN AND VISITING THE 'SUBSCRIPTIONS' TAB OF YOUR ACCOUNT, THEN CLICKING 'MODIFY MY MEMBERSHIP.'  MAKE SURE TO CLICK THROUGH TO CONFIRM YOUR CANCELATION.  ALTERNATIVELY, YOU CAN PROVIDE NOTICE TO BESPOKE POST BY EMAILING US AT HELP@BESPOKEPOST.COM OR CALLING US AT 888.565.6762,

---

notice of Defendant's requirements and procedure for obtaining a refund upon termination of the

Bespoke Post Subscription, as is also disclosed elsewhere on the Bespoke Post Website.[31]  These

undisclosed terms constitute material aspects of Defendant's cancellation policy.

39.     As a result of the inadequate disclosures and/or outright omissions on the

Checkout Page, Plaintiff was not previously aware of the above aspects of Defendant's

cancellation policy.  At no point during the life of her Bespoke Post Subscription was Plaintiff

required or even prompted to navigate to or otherwise examine any of the terms disclosed on the

on any other page of the Bespoke Post Platform aside from the Checkout Page.  Yet, prior to

checkout, Defendant was obligated by law to place consumers on notice of these aspects of

Defendant's cancellation policy in accordance with the ARL, which requires that companies

provide such information "in visual proximity to the request for consent to the [automatic

renewal] offer."  Cal. Bus. & Prof. Code § 17602(a)(1); *see also id*. § 17601(b)(2).  It is not

enough that the cancellation policy may be set forth on the hyperlinked pages located elsewhere

on the Bespoke Post Website; the ARL requires that Defendant present its full cancellation

---

STATING YOUR NAME AND THAT YOU ARE CANCELING YOUR SUBSCRIPTION, OR
WORDS OF SIMILAR EFFECT.  You may also cancel by logging into your account on the Site
and visiting our FAQ page, for a pre-formatted cancellation e-mail template, which you can send
to us."); *see also id.* ("INSTRUCTIONS FOR OPTING OUT OF EACH SUBSCRIPTION
TYPE, IF ANY, MAY BE FOUND ON OUR FAQ PAGE[.]").

    *See also* Bespoke Post FAQ, *available at* https://www.bespokepost.com/faq ("You can
modify or cancel your subscription from the Subscriptions section of your account page, where
you can easily click to swap or skip a monthly box, or continue to cancel your box subscription.
If cancelling, make sure to click-through all the steps until you reach the final confirmation page.
Once confirmed, your club membership will be cancelled effective the 1st of the following
month[.] … In addition to canceling on-site from the subscriptions tab, you can also do so by
texting (914.326.2765) or calling (888.565.6762) us with your name and email address.  You can
also use this pre–formatted email to cancel (help@bespokepost.com – must be signed in).  We'll
make sure to take care of you.") (last visited Feb. 2, 2023).

[31] *See* Bespoke Post FAQ, *supra* ("We accept returns for most boxes and products within 60 days
of an order.  For boxes, we only accept returns of the entire box, and for products, they have to be
returned in the original manufacturer's packaging and in mint condition. … You can choose
an exchange, return for store credit, or a refund to your original credit card. … Please note that
refunds do not include any shipping costs paid on your original order, if applicable.").

---

policy directly on the Checkout Page – and it must further do so "clearly and conspicuously," *id.* § 17601(c), and with the requisite proximity (*i.e.*, they must appear in the block of text immediately above the "JOIN THE CLUB" button on that page), *see id.* § 17602(a)(1) – so as to allow the consumer to read and review the applicable offer terms immediately prior to purchase. However, Defendant failed, and continues to fail, to satisfy that requirement, in violation of Section 17602(a)(1) of the ARL.

40.     Additionally, the Checkout Page for the Bespoke Post Subscription does not adequately disclose the recurring amount to be charged to the subscriber's Payment Method each billing period.  The recurring amount to be charged is tucked away in the top right corner of the Checkout Page—far on the webpage from the "JOIN THE CLUB" button—which is not the portion of the Checkout Page with which the ARL is concerned.  By contrast, the relevant portion of each Checkout Page (i.e., the portion in "visual proximity" to the request for consent, see supra) is utterly silent as to the recurring amounts to be charged following enrollment and/or the end of the trial period.  In fact, no price term whatsoever appears in visual proximity to the gray "JOIN THE CLUB" button near the bottom of the webpage (*i.e.*, the request for consent featured on the Checkout Page).  Further, as above, this disclosure is it not presented in contrasting type face, font size, or color from the surrounding text, and nor is it set off from the surrounding text by any emphasis, symbols, marks, graphics, or any other distinguishing factors that clearly call attention to the language.  The recurring amount to be charged therefore is not "clear and conspicuous" for purposes of the ARL.  Moreover, even if the price term disclosures shown in the screenshot above *were* presented clearly, conspicuously, and within the relevant portion of the Checkout Page (they are not), they still fail to place subscribers on notice of the amount that will be charged to their Payment Methods each month.  For instance, although the Checkout Page indicates a "Membership Fee" of "$0," just beneath that text it also indicates that

"[b]oxes that ship cost $49.00 (+$4.44 tax, and $4.95 shipping)."  However, that is intentionally

misleading, as it remains unclear based on this language whether the consumer will be charged

$0, $49.00, or $58.39 (the sum of all price terms appearing on the Checkout Page) in connection

with the monthly Bespoke Post Subscription Boxes, and whether the price will change.  If the

subscriber will be charged $58.39 every month once the Box ships, the Checkout Page should

say so plainly (*i.e.*, the sum total amount to be charged, without making the consumer perform

math to determine precisely how much money will be withdrawn from his or her Payment

Method each month) and in conspicuous lettering appearing immediately above the "JOIN THE

CLUB" button and immediately next to a checkbox affirming that the consumer understands and

agrees to that price.  That is what the ARL requires.  Thus, with respect to the Bespoke Post

Subscription, Defendant fails to provide notice of "[t]he recurring charges that will be charged to

the consumer's [Payment Method] as part of the automatic renewal plan or arrangement, and that

the amount of the charge may change, if that is the case, and the amount to which the charge will

change, if known[,]" Cal. Bus. & Prof. Code § 17601(b)(3), in violation of Section 17602(a)(1)

of the ARL.

41.     Finally, the Checkout Page fails to adequately disclose the length of the automatic

renewal term associated with the Bespoke Post Subscription, *see* Cal. Bus. & Prof. Code §§

17601(b)(4), 17602(a)(1).  In particular, although the relevant portion of the Checkout Page

shown above states that Defendant will "select a new box … and deliver it to [the consumer's]

door" "[e]ach month," based on that statement, the precise date of a given month or billing

period that the consumer will be charged in connection with the Bespoke Post Subscription is

unclear.  For instance, it is not clear whether "month" refers to the precise calendar date of the

consumer's initial enrollment, in which case the Bespoke Post Subscription would renew every

28-31 days depending on the length of the given month, or refers to four-week intervals, in

which case the Bespoke Post Subscription would renew every 28 days without regard to the calendar date or exception.  Thus, the exact length of each renewal term is ambiguous in terms of start and end date from month-to-month.  And this information is necessary for consumers to successfully affect cancellation because, as noted above, consumers must cancel their Bespoke Post Subscriptions before incurring any subscription charges for the subsequent renewal period in order to avoid getting charged for another billing cycle.[32]  Similarly, the Checkout Page also does not clearly or adequately disclose the length of the free trial, the date that trial will end, or the precise date of a given month (assuming the free trial lasts for the same amount of time as each renewal term associated with the straight-to-paid subscription) or billing period that the free trial will be converted to a paid subscription and the consumer's Payment Method will be charged in connection with the Bespoke Post Subscription.  This information is also necessary for consumers to successfully affect cancellation because, as noted above, consumers who signed up for a free trial "must cancel the trial service from Bespoke Post **before** the end of the trial period in order to avoid becoming a paid subscriber and being charged for that paid Subscription service."[33]  Accordingly, a reasonable consumer would find the statements of the Checkout Page unclear with regard to the length of the applicable automatic renewal terms, as well as when formal cancellation is required in order to stop Defendant from automatically charging renewal fees to customers' Payment Methods on a recurring basis.  If consumers are not on notice of the precise date that their Bespoke Post Subscription will renew and their Payment Methods will be

---

[32] *See* Bespoke Post Terms of Use, *supra* ("CANCELLATION OF YOUR SUBSCRIPTION WILL NOT AFFECT CHARGES INCURRED PRIOR TO THE EFFECTIVE DATE OF CANCELLATION DATE. … Each month, you will be charged when the Subscription is shipped or sometime thereafter, unless you opt out of receiving the Subscription for the given month in accordance with the Terms of Service."); *see also* Bespoke Post FAQ, *supra* ("**When am I charged?**  * At some point between the 6th and 15th of the month, roughly a day before your box ships.") (emphasis in original).

[33] *See* Bespoke Post Terms of Use, *supra* (emphasis added).

charged each month or billing period, they cannot, as a practical matter, affect cancellation before that date.  As such, Defendant fails to disclose "[t]he length of the automatic renewal term or that the service is continuous," Cal. Bus. & Prof. Code § 17601(b)(4), in further violation of Section 17602(a)(1) of the ARL.

42.     As a result of Defendant's missing and otherwise deficient pre-purchase disclosures, when Plaintiff selected and enrolled in her automatic renewal program for a free trial Bespoke Post Subscription, she was unaware that Defendant had enrolled her in an "automatic renewal" program under which her subscription would renew each month and result in continuous monthly automatic renewal charges to her Payment Method unless and until she successfully canceled the subscription.

> **ii.      Defendant Fails To Obtain Consumers' Affirmative Consent To The Undisclosed Automatic Renewal Terms Associated With The Bespoke Post Subscriptions.**

43.     Second, although the Checkout Page contains a checkbox that consumers must click before they can click the "Submit" button and complete their purchase, the text beside the box merely states, "I agree - Let's do this[.]"  That is insufficient to confer affirmative consent because, as consent decrees obtained through ARL enforcement actions in California demonstrate, affirmative consent mechanism must be "[i]mmediately adjacent to the … AUTOMATIC RENEWAL OFFER TERMS … disclosed" on the Checkout Page and in visual proximity to the request for consent at the bottom of that page.  *See People v. Guthy-Renker LLC*, No. 19-cv-341980, at *5 (Cal. Super. Ct. Feb. 1, 2019).[34]  Further, the "check-box, signature, express consent button, or other substantially similar mechanism [for obtaining affirmative consent] … cannot relate to consent for anything other than the AUTOMATIC RENEWAL OFFER TERMS (such as final payment or completion of the transaction)."  *Id*.; *see*

---

[34] *Available at* https://www.law360.com/articles/1125326/attachments/0.

*also People v. Beachbody, LLC*, No. 55029222, at *5 (Cal. Super. Ct. Aug. 24, 2017) (same);

*People v. eHarmony, Inc.*, No. 17-cv-03314, at *4 (Cal. Super. Ct. Jan. 8, 2018) (same).  And

here, the checkbox is not immediately adjacent to the complete automatic renewal terms required

to be disclosed – in fact, there are no line item disclosures accompanying the checkbox

whatsoever – and since the only textual notice provided with the checkbox is a vague and

generally affirmation that "I agree - Let's do this," *see supra* ¶ 34, the consent mechanism clearly

"relate[s] to consent for [terms] other than the AUTOMATIC RENEWAL OFFER TERMS[,

including] final payment or completion of the transaction[.]"  *See Guthy-Renker*, No. 19-cv-

341980, at *5, *supra*.  Thus, in this case, the checkbox of the Checkout Page fails to confer

affirmative consent, and the Checkout Page does not contain any other "check-box, signature,

express consent button, or other substantially similar mechanism" capable of conferring

affirmative consent as required by the ARL and detailed herein.

44.     In any case, even a "checkbox" that consumers must affirmatively click in order

to complete the subscription process would be insufficient to constitute affirmative consent to

terms that appear on a separate page.  *See, e.g., Lopez v. Terra's Kitchen, LLC*, 331 F. Supp. 3d

1092, 1099 (S.D. Cal. 2018) ("Defendant points to no language on its webpages indicating that

by clicking a button on its webpage, the consumer is indicating that he or she has read *and* agrees

to the Terms & Conditions.").  Thus, the checkbox on the Checkout Page here is insufficient to

constitute affirmative consent to the required automatic renewal terms that appear on a separate

webpage of the Bespoke Post Platform, as detailed above.  *See Turnier v. Bed Bath & Beyond*

*Inc.*, 517 F. Supp. 3d 1132, 1139-40 (S.D. Cal. 2021) (ARL case) ("Defendant … argues the

required terms were accessible through a hyperlink that was a few centimeters from the request

for consent.  But the terms themselves—not the access point to them—need to be in visual

proximity to the request.") (emphasis added).

45.     Moreover, Defendant's inclusion of a – very inconspicuous – hyperlink on the Checkout Page leading to other webpages of the Bespoke Post Platform where the required automatic renewal offer terms *are* disclosed likewise undercuts any finding of affirmative consent here, especially since the hyperlink is not included in the textual notice accompanying the checkbox.  *See Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 469-70, 480 (2021), *reh'g denied* (Jan. 18, 2022), *review denied* (Apr. 13, 2022) (ARL case) ("Because 'the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers,' a textual notice of the existence of contractual terms that limit the consumer's ability to address ARL violations should, in our view, be at least as conspicuous as the notice required by the statute in the first instance.  At a minimum, … the statutory requirements of the ARL, and its stated intent to protect consumers from unwittingly being entered into automatically recurring memberships, must be considered as part of the overall transactional context.") (internal citations and some quotation marks omitted). [35]  That is because, as the Ninth Circuit has recognized, "consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound."  *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1179 (9th Cir. 2014); *see also Cavka v. SoulCycle Inc.*, 2017 WL 2906034, at *4 (C.D. Cal. 2017) ("That a consumer could have come across the required information somewhere else on [Defendant's] website does not mean that [Plaintiff] has not suffered a concrete injury when a [business] fails to include the mandatory disclosures in the actual agreement.").

46.     Accordingly, notwithstanding the Checkout Page's inclusion of a checkbox, when Defendant automatically renews customers' Bespoke Post Subscription, Defendant charges

---

[35] *See also B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 948 (2022) ("[T]he *Sellers* court found that in the context of a transaction governed by the ARL, the sign-in wrap notices 'were not sufficiently conspicuous to bind' the plaintiffs because the notices were 'significantly less conspicuous than the statutory notice requirements governing [the plaintiffs'] underlying [ARL] claims.'") (citations omitted).

consumers' Payment Methods without first obtaining their affirmative consent to the agreement

containing the automatic renewal offer terms, "including the terms of an automatic renewal offer

or continuous service offer that is made at a promotional or discounted price for a limited period

of time," in violation of Cal. Bus. & Prof. Code § 17602(a)(2).

<strong>iii.    <u>Defendant Fails To Provide A Post-Checkout<br>Acknowledgment That Clearly And Conspicuously Discloses<br>The Required Bespoke Post Subscription Offer Terms.</u></strong>

47.     After Plaintiff and the members of the Class subscribed to Defendant's Bespoke

Post Subscription, the ARL required that Defendant provide Plaintiff and the Class an purchase

confirmation and/or receipt, or an "acknowledgment," "that includes the automatic renewal offer

terms … offer terms, cancellation policy, and information regarding how to cancel in a manner

that is capable of being retained by the consumer."  Cal. Bus. & Prof. Code § 17602(a)(3).

Further, for consumers that enrolled in a free trial Bespoke Post Subscription, rather than a

straight-to-paid subscription, the ARL also required Defendant to "disclose in the

acknowledgment how to cancel, and allow the consumer to cancel, the automatic renewal or

continuous service before the consumer pays for the goods or services."  *Id.*  Additionally, the

ARL requires that the acknowledgment also "provide a toll-free telephone number, electronic

mail address, a postal address if the seller directly bills the consumer, or it shall [describe]

another cost-effective, timely, and easy-to-use mechanism for cancellation[.]"  Cal. Bus. & Prof.

Code § 17602(c).  Defendant fails to comply with Sections 17602(a)(3) and 17602(c) of the ARL

in every respect because **Defendant does not provide subscribers with *any* post-purchase**

**acknowledgement containing the required information, in plain violation of the ARL**.  *Id.*

<strong>iv.    <u>Defendant Fails To Provide A Timely Or Easy-To-Use<br>Mechanism For Cancellation.</u></strong>

48.     Finally, even if Defendant *had* provided an acknowledgment that describes the

cancellation mechanism as required (it does not), the "mechanism for cancellation" of the

Bespoke Post Subscriptions is not one that Plaintiff or reasonable consumers would consider "timely" or "easy-to-use" as the ARL requires. *See* Cal. Bus. & Prof. Code § 17602(c). As is discussed further below, in or around July 2019, Plaintiff attempted to cancel her Bespoke Post Subscription, which she struggled to do due to Defendant's confusing cancellation policy, the most crucial aspects of which were obscured in and/or altogether missing from the Checkout Page and *never* provided in any Acknowledgment Email. Thus, as a direct result of Defendant's non-compliant cancellation mechanism, Plaintiff and putative Class Members have incurred substantial financial injury.

\* \* \*

49. In sum, Defendant's deficient pre- and post-purchase disclosures and lack of affirmative consent fail to comply with the ARL. By and through these actions, Defendant has charged Plaintiff's and Class members' Payment Methods in direct violation of the ARL. As a result, all goods, wares, merchandise, and/or products sent to Plaintiff and the Class upon the automatic renewal of their continuous service agreements are deemed to be "unconditional gifts" pursuant to Cal. Bus. & Prof. Code § 17603.

50. Because Defendant failed to disclose this material information in the manner required by statute, Plaintiff was unable at the point of sale to accept or provide affirmative consent to Defendant's offer or knowingly enter into to the purchase agreements. Thus, as a direct result of Defendant's missing, incomplete, and otherwise deficient disclosures on the Checkout Page and in the nonexistent Acknowledgment Email, Plaintiff was induced to sign up for, unable to terminate, and automatically charged for her Bespoke Post Subscription.

51. Accordingly, Plaintiff brings this action individually and on behalf of similarly situated individuals against Defendant for violations of California's consumer protections statutes, including California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§

17200.  As set forth in detail below, Plaintiff's claims, which are based on Defendant's failure to comply with the ARL, arise under the "unlawful" prong of the UCL.  Further, because the Bespoke Post Subscription was, by operation of law, "unconditional gifts" to Plaintiff and putative Class Members (*see* Cal. Bus. & Prof. Code § 17603) – and thus, Plaintiff and Class Members already owned the goods, tools, and benefits of the subscriptions as their personal property at the time Defendant withdrew monies from their Payment Methods as consideration for access to the same, without any legal or contractual authority to do so – Plaintiff's claims, which are also based on Defendant's practice of charging consumers in exchange for unconditional gifts, also arise under the "fraudulent" and "unfair" prongs of the UCL. Additionally, Plaintiff brings this action against Defendant for violations of the CLRA and FAL, and for conversion, unjust enrichment, negligent misrepresentation, and fraud.

<u>**PLAINTIFF'S INDIVIDUAL ALLEGATIONS**</u>

52.     Plaintiff Roxanne Garcia is an individual consumer who signed up for a free trial of Bespoke Post in or around July 2019, from Defendant's website while in California.  At the time Ms. Garcia signed up for her Bespoke Post Subscription, she provided her Payment Method information directly to Defendant.

53.     Before Ms. Garcia purchased her Bespoke Post Subscription, Defendant did not disclose to Ms. Garcia all required automatic renewal offer terms associated with the subscription program.  Additionally, although the Checkout Page from which Ms. Garcia made her purchase included some relevant information regarding automatic renewal, the manner in which this information was presented was insufficient to put Ms. Garcia on notice of the material automatic renewal offer terms applicable to the Bespoke Post Subscription.  Specifically, prior to completing her Bespoke Post Subscription order, the relevant screens and buttons presented to Ms. Garcia did not clearly and conspicuously state that her Bespoke Post Subscription would

automatically renew every month until she cancelled; they did not state the recurring charges that would be charged to Ms. Garcia's Payment Method as part of the automatic renewal plan, explain that the timing of the charge would change, or disclose the monthly date to which the charge would change; and they did not describe the full cancellation policy that applied to the purchase.

54.     Moreover, at no point prior to completing her initial purchase did Defendant obtain Ms. Garcia's affirmative consent to an agreement containing the automatic renewal offer terms.

55.     After Ms. Garcia completed her initial order, Defendant sent Ms. Garcia an email stating that her Bespoke Post Subscription had been activated and what the contents of her first box would be.  However, that Acknowledgment Email failed to provide Ms. Garcia with any of the automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation policy, or information regarding how to cancel Ms. Garcia's Bespoke Post Subscription in a manner capable of being retained by her.  Ms. Garcia did not receive any other acknowledgments that contain the required information.

56.     As a result of Defendant's missing and otherwise deficient disclosures, when Ms. Garcia selected and enrolled in her free trial Bespoke Post Subscription, she was unaware that Defendant had enrolled her in an "automatic renewal" program under which the subscription would renew each month and result in continuous monthly automatic renewal charges to her Payment Method unless and until Plaintiff chose to cancel.

57.     Nevertheless, on August 25, 2019, approximately one month after Ms. Garcia first signed up for her free trial of Bespoke Post, Defendant automatically renewed Ms. Garcia's Bespoke Post Subscription and charged her Payment Method in the amount of $53.56, the full monthly rate associated with the paid monthly Bespoke Post Subscription, without Ms. Garcia's

knowing consent.

58.     Ms. Garcia's confusion and surprise with respect to Defendant's billing practices is the direct result of Defendant's failure to place Ms. Garcia on notice of the recurring amount that would be charged to her Payment Method as part of the Bespoke Post Subscription. Because Defendant failed to disclose this material information in the manner required by statute, Ms. Garcia was unable at the point of sale to accept Defendant's offer or knowingly enter into the purchase agreement.

### Defendant's Undisclosed Cancellation Policy

59.     Frustrated with Defendant's confusing billing practices and other hidden automatic renewal terms, Ms. Garcia attempted to cancel her Bespoke Post Subscription in or around July 2019.  However, finding no useful guidance in the vague and incomplete terms that were presented to her on the Checkout Page at the point of sale and later in the Acknowledgment Email, Ms. Garcia struggled immensely with the cancellation process.  Specifically, Ms. Garcia had to seek out a customer service number, call that number, then receive an email address to which she sent a request for cancellation.  However, one month later, in August 2019, Ms. Garcia learned upon review of her banking history that, notwithstanding her attempt to cancel in July 2019, Defendant had automatically renewed Ms. Garcia's Bespoke Post Subscription and, without her authorization (and, indeed, despite Ms. Garcia's express denial of such authorization), charged Ms. Garcia's Payment Method another monthly renewal fee for the following billing cycle, in the amount of $53.56.  Thus, Ms. Garcia's attempt at cancellation one month earlier was utterly ineffective.

60.     Notably, neither the Checkout Page nor the Acknowledgment Email contain any explanation whatsoever regarding how to cancel the Bespoke Post Subscription.  As a result, based on the pre- and post-check out disclosures featured on the Checkout Page and in the

Acknowledgment Email, Ms. Garcia did not know that "the effective date of cancellation of your Subscription will be the first day of the month after you submit your cancellation request, regardless of the date of the current month in which you submit such request," or that "you will still receive a subscription for [the month in which you submit the cancellation request], unless you also opt out of [that month's Subscription]," as is set forth on Defendant's Terms and Conditions webpage.

61.     Ms. Garcia was not previously aware of any of the above aspects of Defendant's cancellation policy.  At no point during her Bespoke Post Subscription was Ms. Garcia required or even prompted to navigate to or otherwise examine any of the terms disclosed on any other page of the Bespoke Post Website aside from the Checkout Page.  Further, Defendant neglected to disclose this information to Ms. Garcia at the point of purchase on the Checkout Page or in the Acknowledgment Email that Defendant was supposed to send to Ms. Garcia after she completed the checkout process.  Accordingly, Defendant failed to place Ms. Garcia on notice of its cancellation policy or provide Ms. Garcia information regarding how to cancel in a manner that is capable of being retained by her, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(1)-(3).

62.     Moreover, even if the Acknowledgment Email had contained Defendant's complete cancellation policy (it did not), the "mechanism for cancellation" that exists is not one that Ms. Garcia and other reasonable consumers would consider "timely" or "easy-to-use." Defendant therefore failed to provide Ms. Garcia with a "timely[] and easy-to-use mechanism for cancellation" or describe any such mechanism in an Acknowledgment Email, in violation of Cal. Bus. & Prof. Code § 17602(c).

63.     Thus, as a direct result of Defendant's missing, incomplete, and otherwise deficient disclosures on the Checkout Page and in the nonexistent Acknowledgment Email, Ms. Garcia was induced to sign up for, and unable to terminate, her Bespoke Post Subscription.

64.   Ms. Garcia was unable to cancel her Bespoke Post Subscription until on or around August 2019, but by that point the damage had been done.  During this period, Defendant charged, in total, at least $53.56 in unauthorized renewal fees to Ms. Garcia's Payment Method without her knowing or affirmative consent.

65.   Defendant's pre- and post-checkout disclosures therefore fail to comply with the ARL, which deems products provided in violation of the statute to be unconditional gifts to consumers.  *See* Cal. Bus. & Prof. Code § 17603.

66.   As a direct result of Defendant's unlawful conduct described above, Ms. Garcia suffered economic injury.  Specifically, Defendant's ARL violations caused Ms. Garcia's financial injury because Ms. Garcia reasonably relied on Defendant's conspicuous disclosures on the Checkout Page and the Acknowledgment Email (and, as a natural corollary, Defendant's omissions and/or the inconspicuousness of the disclosures contained therein) in deciding whether to purchase her Bespoke Post Subscription in the first place and whether to continue paying for it after that (*i.e.*, by not cancelling the auto-renewal).  Had Defendant complied with the ARL by adequately disclosing – and obtaining Ms. Garcia's affirmative consent to – the requisite Bespoke Post Subscription terms on the Checkout Page at the point of Ms. Garcia's initial enrollment in July of 2019, Ms. Garcia would have been able to read and review the auto renewal terms prior to purchase and she would have not subscribed to Bespoke Post, thereby avoiding financial injury of any kind as a result of Defendant's ARL violations.  Similarly, had Defendant complied with the ARL by adequately disclosing the terms associated with Ms. Garcia's Bespoke Post Subscription in a post-checkout Acknowledgment Email (*i.e.*, after initial enrollment but before  Defendant subsequently automatically renewed Ms. Garcia's Bespoke Post Subscription and charged her Payment Method accordingly), Ms. Garcia would have been able to read and review the auto renewal terms prior to renewal, and she would have canceled her

Bespoke Post Subscription prior to the expiration of the subscription period in which she would have learned such information, thereby avoiding all or part of the $53.56 in automatic renewal charges Ms. Garcia incurred from July 2019 to August 2019.  But Defendant did not adequately disclose the required automatic renewal terms in either the Checkout Page or send the Acknowledgment Email, thereby depriving Ms. Garcia of the opportunity to make an informed decision as to the transaction.

67.     The facts giving rise to Ms. Garcia's claims are materially the same as the Class she seeks to represent.

## CLASS ACTION ALLEGATIONS

68.     ***Class Definition***. Plaintiff brings this action pursuant to Rule 23(a) of the Federal Rules of Civil Procedure on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All persons in California who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, incurred renewal fee(s) in connection with Defendant's offering for a paid Bespoke Post Subscription.

69.     Specifically excluded from the Class are Defendant and any entities in which Defendant have a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

70.     Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

71.     ***Numerosity.***  Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, the Class comprises at least thousands of consumers throughout California.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution

records of Defendant.

72.     ***Commonality and Predominance***.  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Defendant's Bespoke Post Subscription constitute "Automatic renewal[s]" within the meaning of Cal. Bus. & Prof. Code § 17601(a); (b) whether Defendant failed to present the automatic renewal offer terms, or continuous service offer terms, in a clear and conspicuous manner before the subscription or purchasing agreement was fulfilled and in visual proximity to the request for consent to the offer, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (c) whether Defendant charged Plaintiff's and Class members' Payment Method for an automatic renewal or continuous service without first obtaining their affirmative consent to the automatic renewal offer terms or continuous service offer terms in violation of Cal. Bus. & Prof. Code § 17602(a)(2); (d) whether Defendant failed to provide an acknowledgment that included the automatic renewal or continuous service offer terms, cancellation policy, and information on how to cancel in a manner that is capable of being retained by Plaintiff and the Class, in violation of Cal. Bus. & Prof. Code § 17602(a)(3); (e) whether the goods and services provided by Defendant are deemed an "unconditional gift" in accordance with Cal. Bus. & Prof. Code § 17603; (f) whether Defendant's conduct alleged herein violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*., California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, and/or California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (g) whether Defendant's conduct alleged herein constitutes conversion and/or unjust enrichment; (h) whether Plaintiff and the Class are entitled to damages and/or restitution; (i) whether Defendant should be enjoined from further engaging in the misconduct alleged herein; and (j) whether Plaintiff and the Class are entitled to attorneys' fees

and costs under California Code of Civil Procedure § 1021.5.

73.     ***Typicality.***  The claims of Plaintiff are typical of the claims of the Class in that Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to obtain Plaintiff's and the Class's affirmative consent to the automatic renewal offer terms or continuous service offer terms associated with the Bespoke Post Subscription before charging their Payment Methods.

74.     ***Adequacy***.  Plaintiff will fairly and adequately protect Class members' interests. Plaintiff has no interests antagonistic to Class members' interests, and Plaintiff has retained counsel that have considerable experience and success in prosecuting complex class-actions and consumer-protection cases.

75.     ***Superiority***.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

76.     Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

77.     Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Class and will likely retain the benefits of its wrongdoing.

78.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

<u>**COUNT I**</u>
**Violations of California's Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

79.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

80.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

81.     The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]"  Cal. Bus. & Prof. Code § 17200.  The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.  Cal. Bus. & Prof. Code § 17204.  Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

82.     As alleged below, Defendant has committed unlawful, fraudulent, and/or unfair business practices under the UCL by: (a) representing that Defendant's goods and services have certain characteristics that they do not, in violation of Cal. Civil Code § 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9); and (c) converting to Defendant's own use and benefit money that rightfully belongs to Plaintiff and the Class.

83.     Additionally, at all relevant times, Defendant has violated, and continues to violate, the UCL's proscription against engaging in unlawful, fraudulent, and/or unfair conduct as a result of its violations of the ARL, Cal. Bus. & Prof. Code §§ 17600, *et seq.*  Specifically, Defendant failed, and continues to fail, to: (a) provide the auto-renewal terms associated with its Bespoke Post Subscription "in a clear and conspicuous manner before the subscription or

purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer," in violation of Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain the affirmative consent of Plaintiff and the Class to those terms before charging their Payment Methods, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (c) provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3). Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Bespoke Post Subscription, in violation of Cal. Bus. & Prof. Code § 17602(b).

84. Each of these acts and practices constitutes an independent violation of the ARL, and thus an independent violation of the UCL.

85. All products received from Defendant in violation of the ARL, Cal. Bus. Prof. Code §§ 17602, *et seq.*, constitute "unconditional gifts." *See* Cal. Bus. Prof. Code § 17603. As a direct and proximate result of Defendant's unlawful and/or unfair practices described herein, Defendant has received, and continues to hold, unlawfully obtained property and money belonging to Plaintiff and the Class in the form of payments made by Plaintiff and Class members for their Bespoke Post Subscription. Defendant has profited from its unlawful, fraudulent and/or unfair acts and practices in the amount of those business expenses and interest accrued thereon.

86. Defendant's acts and omissions as alleged herein violate obligations imposed by statute, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

87. There were reasonably available alternatives to further Defendant's legitimate

business interests, other than the conduct described herein.

88.     Defendant's acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public.

89.     Plaintiff and the members of the Class have suffered a substantial injury in fact and lost money by virtue of Defendant's acts of unfair competition, which caused them to purchase the Bespoke Post Subscription.  Had Defendant complied with its disclosure obligations under the ARL, Plaintiff and members of the Class would not have purchased their Bespoke Post Subscription or would have cancelled their Bespoke Post Subscription prior to the renewal of the subscriptions, so as not to incur additional fees.  Thus, Plaintiff and members of the Class were damaged and have suffered economic injuries as a direct and proximate result of Defendant's unlawful and/or unfair business practices.

90.     Defendant's violations have continuing and adverse effects because Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this unlawful course of conduct.  The public and the Class are subject to ongoing harm because the unlawful and/or unfair business practices associated with the Bespoke Post Subscription are still used by Defendant today.

91.     Plaintiff and the Class seek restitution pursuant to Cal. Bus. & Prof. Code § 17203 of all amounts that Defendant charged or caused to be charged to Plaintiff's and the Class's Payment Methods in connection with their Bespoke Post Subscription during the four years preceding the filing of this Complaint.  Defendant should be required to disgorge all the profits and gains it has reaped and restore such profits and gains to Plaintiff and the Class, from whom they were unlawfully taken.

92.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and members of the Class seek a court order enjoining Defendant from such future misconduct, and any other such orders

that may be necessary to rectify the unlawful business practices of Defendant.

93.     Plaintiff brings this action as private attorney general and to vindicate and enforce an important right affecting the public interest.  Plaintiff and the Class are therefore entitled to an award of attorneys' fees under Code of Civil Proc. § 1021.5 for bringing this action.

## COUNT II
### Conversion

94.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

95.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

96.     As a result of charges made by Defendant to Plaintiff's and Class members' Payment Methods without authorization and in violation of California law, Defendant has taken money that belongs to Plaintiff and the Class.

97.     The amount of money wrongfully taken by Defendant is capable of identification.

98.     Defendant engaged in this conduct knowingly, willfully, and with oppression, fraud, and/or malice within the meaning of Cal. Civil Code § 3294(c).

99.     As a result of Defendant's actions, Plaintiff and the Class have suffered damages.

## COUNT III
### Violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*

100.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

101.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

102.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated

before the public in this state,  …in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

103.   Defendant committed acts of false advertising, as defined by § 17500, by intentionally making and disseminating statements to consumers in California and the general public concerning Defendant's products and services, as well as circumstances and facts connected to such products and services, which are untrue and misleading on their face and by omission, and which are known (or which by the exercise of reasonable care should be known) by Defendant to be untrue or misleading.  Defendant has also intentionally made or disseminated such untrue or misleading statements and material omissions to consumers in California and to the public as part of a plan or scheme with intent not to sell those services as advertised.

104.   Defendant's statements include but are not limited to representations and omissions made to consumers before and after enrollment in Defendant's Bespoke Post Subscription regarding the terms of payment for and cancellation of a consumer's automatic payments.  Defendant is silent with regard to the terms of its cancellation policy.  These omissions on the Checkout Page constitute false and deceptive advertisements.

105.   Defendant's actions in violation of § 17500, as described herein, were false and misleading such that the general public is and was likely to be deceived.

106.   Plaintiff and the members of the Class were deceived by Defendant's statements and omissions made online when they signed up and started paying for their Bespoke Post Subscription, and there is a strong probability that other California consumers and members of the public were also or are likely to be deceived as well.  Any reasonable consumer would be

misled by Defendant's false and misleading statements and material omissions.  Plaintiff and

other members of the Class did not learn of Defendant's cancellation and automatic payment

policies until after they had already signed up and started paying for Defendant's Bespoke Post

Subscription.  They relied on Defendant's statements and omissions to their detriment.

107.    Plaintiff and the Class lost money or property as a result of Defendant's FAL

violations because they would not have purchased the Bespoke Post Subscription on the same

terms if the true facts were known about the product and the Bespoke Post Subscription do not

have the characteristics as promised by Defendant.

108.    Plaintiff, individually and on behalf of all similarly situated California consumers,

seeks individual, representative, and public injunctive relief and any other necessary orders or

judgments that will prevent Defendant from continuing with its false and deceptive

advertisements and omissions; restitution that will restore the full amount of their money or

property; disgorgement of Defendant's relevant profits and proceeds; and an award of costs and

reasonable attorneys' fees.

**COUNT IV**
**Violations of California's Consumers Legal Remedies Act ("CLRA"),**
**Cal. Civ. Code §§ 1750, *et seq.***

109.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the

preceding paragraphs as though alleged in this Count.

110.    Plaintiff brings this claim individually and on behalf of the members of the

proposed Class against Defendant.

111.    Plaintiff and the members of the Class are "consumers" within the meaning of

Cal. Civil Code § 1761(d) in that Plaintiff and the Class sought or acquired Defendant's goods

and/or services for personal, family, or household purposes.

112.    Defendant's selection and/or subscription offers and the other products pertaining

thereto are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a) and (b). The purchases by Plaintiff and the Class are "transactions" within the meaning of Cal. Civil Code § 1761(e).

113.    The acts and practices of Defendant as described above were intended to deceive Plaintiff and the Class as described herein, and have resulted, and will result, in damages to Plaintiff and the Class.  These actions violated, and continue to violate, the CLRA in at least the following respects: (a) Defendant's acts and practices constitute representations or omissions deceiving that the Bespoke Post Subscription have characteristics, uses, and/or benefits, which they do not, in violation of Cal. Civil Code §1770(a)(5); and (b) Defendant's acts and practices constitute the advertisement of the goods in question without the intent to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9).

114.    Plaintiff and the Class suffered economic injury as a direct result of Defendant's misrepresentations and/or omissions because they were induced to purchase the Bespoke Post Subscription and/or pay renewal fees they would not have otherwise purchased and/or paid.  Had Defendant fully and clearly disclosed the terms associated with the Bespoke Post Subscription, Plaintiff and the Class would have not subscribed to the Bespoke Post Subscription, or they would have cancelled their Bespoke Post Subscription earlier, *i.e.*, prior to the expiration of the initial subscription period or any subsequent renewal term.

115.    Plaintiff, on behalf of herself and all other members the Class, seeks an injunction prohibiting Defendant from continuing its unlawful practices in violation of the CLRA.

116.    In compliance with the provisions of California Civil Code § 1782, Plaintiff sent written notice to Defendant on February 10, 2023, informing Defendant of her intention to seek damages under California Civil Code § 1750.  The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that it

cease and desist from such violations and make full restitution by refunding the monies received therefrom. The letter expressly stated that it was sent on behalf of Plaintiff and "all other persons similarly situated." Accordingly, if Defendant fails to take corrective action within 30 days of receipt of the demand letter, Plaintiff will amend her complaint to include a request for damages as permitted by Civil Code § 1782(d) for Defendant's violations of the CLRA.

**COUNT V**
**Unjust Enrichment / Restitution**

117.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

118.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

119.    Plaintiff and the Class conferred benefits on Defendant by purchasing the Bespoke Post Subscription.

120.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and the Class's purchases of the Bespoke Post Subscription. Retention of those moneys under these circumstances is unjust and inequitable because Defendant's failure to disclose material terms of the purchase agreement, in violation of California law, induced Plaintiff and the Class to purchase the Bespoke Post Subscription. These omissions caused injuries to Plaintiff and the Class because they would not have purchased the Bespoke Post Subscription at all, or on the same terms, if the true facts were known.

121.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and the Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class for their unjust enrichment, as ordered by the Court.

## <u>COUNT VI</u>
### Negligent Misrepresentation

122.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

123.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

124.    As discussed above, Defendant omitted, failed to disclose, and intentionally concealed from its advertisements and related statements regarding the Subscriptions material facts concerning billing, cancellation, and automatic payment terms, policies, and requirements.

125.    At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

126.    At an absolute minimum, Defendant negligently misrepresented and/or negligently omitted material facts about the Bespoke Post Subscription and their associated terms.

127.    The negligent misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase and enroll in Defendant's Bespoke Post Subscription programs.

128.    Plaintiff and Class members would not have purchased the Bespoke Post Subscription if the true facts had been known.

129.    The negligent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT VII
**Fraud**

130.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

131.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

132.    As discussed above, Defendant provided Plaintiff and Class members with false or misleading material information and failed to disclose material facts about the Bespoke Post Subscription and their associated automatic renewal terms, including terms regarding Defendant's cancellation policy and billing practices and policies.  These misrepresentations and omissions were made by Defendant with knowledge of their falsehood.

133.    The misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Bespoke Post Subscription.

134.    The fraudulent actions of Defendant caused damage to Plaintiff and the members of the Class, who are entitled to damages and other legal and equitable relief as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Garcia, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

    a.    For an order certifying the Class, naming Plaintiff as a representative of the Class, and appointing Plaintiff's attorneys as Class Counsel to represent the Class;

    b.    For an order declaring Defendant's conduct violates the statutes referenced herein;

    c.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

    d.    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.      For prejudgment interest on all amounts awarded;

f.      For an order of restitution and all other forms of equitable monetary relief;

g.      For injunctive relief as pleaded or as the Court may deem proper; and

h.      For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on any and all causes of action and issues so triable.

Dated: February 10, 2023                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   */s/ Frederick J. Klorczyk III*

Frederick J. Klorczyk III
888 Seventh Avenue
New York, NY  10019
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email: fklorczyk@bursor.com

**BURSOR & FISHER, P.A.**
Neal J. Deckant
Julia K. Venditti *
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email: ndeckant@bursor.com
          jvenditti@bursor.com

*\* Pro Hac Vice application forthcoming*
*Attorneys for Plaintiff and the Putative Class*

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Frederick J. Klorczyk III, declare as follows:

1.      I am an attorney at law licensed to practice in the State of New York and a member of the bar of this Court.  I am a Partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Roxanne Garcia ("Plaintiff") in this action.  Plaintiff alleges that she is a citizen of California who resides in Long Beach, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Southern District of New York.  Additionally, Defendant has its principal place of business in this District.

I declare under the penalty of perjury under the laws of the State of New York and the United States that the foregoing is true and correct and that this declaration was executed at New York, New York , this 10th day of February, 2023.


*/s/ Frederick J. Klorczyk III*
Frederick J. Klorczyk III