UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

ROXANNE GARCIA, on behalf of herself and all others similarly situated,

                Plaintiff,

- against -

NABFLY, INC., d/b/a BESPOKE POST,

                Defendant.

**ORDER**

23 Civ. 1162 (PGG)

---------------------------------------------------------------

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Roxanne Garcia brings a putative class action against Defendant Nabfly, Inc., d/b/a Bespoke Post ("Bespoke"), alleging negligent misrepresentation, fraud, conversion, unjust enrichment, and violations of California consumer protection laws.  Plaintiff contends that Bespoke does not adequately disclose to consumers its terms for automatic renewal of subscriptions, in violation of California's Automatic Renewal Law, Cal. Bus. Prof. Code §§ 17600 et seq.  (See, e.g., Am. Cmplt. (Dkt. No. 17) ¶ 1)

        Defendant has moved to compel arbitration and for a stay pending arbitration, pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 4.  For the reasons stated below, Defendant's motion will be granted.

**BACKGROUND**

**I.     FACTS**

        Defendant is a Delaware corporation with its principal place of business in New York.  (Am. Cmplt. (Dkt. No. 17) ¶ 10)  Bespoke offers a monthly subscription service in which subscribers receive "curated" "products," such as "cocktail kits, shave sets, and coffee products," in exchange for paying a monthly fee.  (Id. ¶ 1 & n.1)

> [W]hen consumers sign up for the Bespoke Post Subscription, Defendant actually enrolls consumers in a program that automatically renews the Bespoke Post Subscription from month-to-month and results in monthly charges to the consumer's credit card, debit card, or third-party payment account ("Payment Method"). In doing so, Defendant fails to provide the requisite disclosures and authorizations required to be made to California consumers under California's Automatic Renewal Law ("ARL"), Cal. Bus. Prof. Code §§ 17600, et seq.

(Id. ¶ 1)

Plaintiff Garcia is a citizen of California. (Id. ¶ 9) The Amended Complaint alleges that Garcia "signed up for a free trial of Bespoke Post in or around July 2019, from Defendant's website[,] [and] while in California." (Id. ¶ 52) According to the Amended Complaint, "[a]t the time Ms. Garcia signed up for her Bespoke Post Subscription, she provided her Payment Method information directly to Defendant." (Id.)

Defendant has provided records indicating that Plaintiff created her account on Bespoke's website at 12:23 p.m. on August 24, 2019. (Lamberton Decl. (Dkt. No. 26) ¶ 16 and Ex. B (Dkt. No. 26-2) (user account records))[1]

According to Defendant, to subscribe to Bespoke's service, a consumer completes a three-step process. (Lamberton Decl. (Dkt. No. 26) ¶¶ 4-12)[2] The consumer first completes a "twelve-question quiz" to assess his or her preferences. (Id. ¶¶ 4-6)

The consumer then creates an account on Bespoke's website. (Id. ¶ 7) As of August 2019, the registration page appeared as follows:

---

[1] In resolving a motion to compel arbitration, courts "'consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits,'" and draw all reasonable inferences in favor of the non-moving party. Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002)).

[2] Plaintiff does not dispute any of following facts regarding the registration process or Bespoke's Terms of Use. (Pltf. Opp. (Dkt. No. 27) at 8-9, 16-28)

[Screenshot of a "Create Your Account" form with fields for First Name (showing error "Please enter your first name."), Last Name, Email Address, Password, and a dropdown "Where did you hear about us?", followed by a blue "Create Account" button. Below the button: "Already have an account? Sign In" and "By creating an account you agree to the Terms of Use and Privacy Policy"]

(Id. ¶ 9)  As shown above, the consumer is prompted to create a password and to enter first name, last name, and email address.  (Id.)  A blue "Create Account" button is displayed on the screen.  (Id.)

The following language appears below the "Create Account" button:  "By creating an account, you agree to the **Terms of Use** and **Privacy Policy**."  (Id. ¶¶ 8, 9) (emphasis in original)  The text associated with the phrase "Terms of Use" and "Privacy Policy" are hyperlinked in bold, blue lettering.  When a consumer clicks on the invitation to review and agree to the Terms of Use, the hypertext link takes the consumer to a separate webpage entitled "Terms of Use."  (Id. ¶ 8)  Bespoke's "Privacy Policy" is similarly hyperlinked.  (Id.)

As of August 2019, Bespoke's Terms of Use were as follows:

**Governing Law and Jurisdiction**

PLEASE READ THIS SECTION CAREFULLY BECAUSE IT OUTLINES
CERTAIN RIGHTS THAT YOU ARE WAIVING OR LIMITING BY USING
OUR SERVICE AND PURCHASING OUR PRODUCTS.  REMEMBER, THAT

3

> YOUR USE OF THE SERVICES CONSTITUTES YOUR ACCEPTANCE OF THESE TERMS OF SERVICE, INCLUDING THE PROVISIONS RELATING TO GOVERNING LAW AND JURISDICTION.
>
> THIS SECTION LIMITS CERTAIN RIGHTS YOU MIGHT OTHERWISE HAVE INCLUDING:  (1) THE RIGHT TO HAVE DISPUTES BETWEEN YOU AND US GOVERNED BY THE LAW OF ANY JURISDICTION, OTHER THAN THAT OF THE STATE OF NEW YORK, AND (2) THE RIGHT TO ADDRESS ANY SUCH DISPUTE OUTSIDE OF NEW YORK.
>
> These Terms of Service, and any dispute arising between you and us arising out of or relating to these Terms of Service, the Services or the Content, shall be governed by and construed in accordance with the laws of the State of New York, including its conflicts of law rules, and the United States of America.

(Lamberton Decl., Ex. C (Dkt. No. 26-3) at 13-14) (emphasis in original)

Bespoke's Terms of Use contain the following arbitration clause:

> Any and all controversies, disputes, demands, counts, claims, or causes of action (including the interpretation and scope of this clause, and the arbitrability of the controversy, dispute, demand, count, claim, or cause of action) between you and us or our employees, agents, successors, or assigns, will exclusively be settled through binding and confidential arbitration.  Arbitration will be subject to the Federal Arbitration Act and not any state arbitration law. . . .
>
> There is no judge or jury in arbitration, and court review of an arbitration award is limited.  However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the terms of this Agreement as a court would.
>
> The Parties agree as follows: (a) ANY CLAIMS BROUGHT BY A PARTY MUST BE BROUGHT IN SUCH PARTY'S INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING . . .

(Id. at 14) (emphasis in original)

According to Defendant, before a consumer finalizes a purchase through Bespoke's website, the consumer is directed to the following payment webpage:



(Lamberton Decl. (Dkt. No. 26) ¶¶ 11-12)  On this payment page, the consumer again has access to the Terms of Use, through a hyperlink associated with the text "See full terms here."  (Id. ¶ 12)  When this phrase is clicked, the consumer is directed to the Terms of Use.  (Id.)  To complete a purchase, the consumer must click a checkbox acknowledging that she agrees with the Terms of Use:  "I agree – Let's do this."  (Id.)

According to the Amended Complaint, "on August 25, 2019, approximately one month after Ms. Garcia first signed up for her free trial of Bespoke Post, Defendant automatically renewed Ms. Garcia's Bespoke Post Subscription and charged her Payment Method in the amount of $53.56, the full monthly rate associated with the paid monthly Bespoke Post Subscription, without Ms. Garcia's knowing consent."  (Am. Cmplt. (Dkt. No. 17) ¶ 57)

5

According to Defendant, on August 26, 2019, Plaintiff "contacted Bespoke [] by email and telephone, and requested that her subscription be cancelled." (Lamberton Decl. (Dkt. No. 26) ¶ 24)  Bespoke "agreed to cancel her subscription."  (Id.)

## II. PROCEDURAL HISTORY

The Amended Complaint was filed on May 10, 2023, as a putative class action brought on behalf of "[a]ll persons in California who . . . incurred renewal fee(s) in connection with Defendant's offering for a paid Bespoke Post Subscription."  (Am. Cmplt. (Dkt. No. 17) ¶¶ 9, 68)  The Amended Complaint asserts claims for negligent misrepresentation, fraud, conversion, unjust enrichment, and violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq., the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq., and the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq.  (Id. ¶¶ 79-134)

On October 6, 2023, Defendant moved to compel arbitration and to stay this action pending arbitration, pursuant to the Federal Arbitration Act, arguing that the parties' dispute is subject to the arbitration clause contained in its Terms of Use.  (Def. Mot. (Dkt. No. 24); Def. Br. (Dkt. No. 25) at 7)

## DISCUSSION

## I. LEGAL STANDARDS

Under the FAA, an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA provides that a party to an arbitration agreement may petition a district court for "an order directing that . . . arbitration proceed in the manner provided for in such [an] agreement."  9 U.S.C. § 4.  The FAA "reflect[s] both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract."  AT&T

Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (citations and internal quotation marks omitted).  Given the federal policy favoring arbitration, "doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration."  Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC, 645 F.3d 522, 526 (2d Cir. 2011).  However, this "presumption [of arbitrability] does not apply to disputes concerning whether an agreement to arbitrate has been made."  Id.

In deciding whether claims are subject to arbitration, courts must determine (1) "whether the parties agreed to arbitrate"; (2) "the scope of that agreement"; (3) "if federal statutory claims are asserted, . . . whether Congress intended those claims to be nonarbitrable"; and (4) if "some, but not all, of the claims in the case are arbitrable, . . . whether to stay the balance of the proceedings pending arbitration."  Guyden v. Aetna, Inc., 544 F.3d 376, 382 (2d Cir. 2008) (citation and internal quotation marks omitted).

Motions to compel arbitration pursuant to the FAA are considered "under a standard similar to the standard for a summary judgment motion."  Kutluca v. PQ N.Y. Inc., 266 F. Supp. 3d 691, 700 (S.D.N.Y. 2017) (citing Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)).  "A party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid."  Harrington v. Atl. Sounding Co., Inc., 602 F.3d 113, 124 (2d Cir. 2010) (citing Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91-92 (2000)).

As discussed above, in resolving a motion to compel arbitration, courts "'consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits,'" and

draw all reasonable inferences in favor of the non-moving party. Nicosia, 834 F.3d at 229 (quoting Chambers, 282 F.3d at 155).

## II.     ANALYSIS

The parties dispute (1) whether they entered into an agreement to arbitrate; and (2) if so, the scope of any such agreement. (See Def. Br. (Dkt. No. 25) at 15-28; Pltf. Opp. (Dkt. No. 27) at 20-32)

### A.     Choice of Law

State contract law governs the inquiry into whether parties agreed to arbitrate. See Meyer v. Uber Techs., Inc., 868 F.3d 66, 73-74 (2d Cir. 2017) Here, as discussed above, the Terms of Use state that

> any dispute arising between you and us arising out of or relating to these Terms of Use, the Services or the Content, shall be governed by and construed in accordance with the laws of the State of New York, including its conflicts of laws rules. . . .

(Lamberton Decl. (Dkt. No. 26), Ex. C (Dkt. No. 26-3) at 14)

Moreover, because the parties agree that New York law and California law concerning mutual assent to a contract term is substantially the same (see Pltf. Opp. (Dkt. No. 27) at 12 (noting that "'New York and California apply substantially similar rules'" to this issue) (quoting Meyer, 868 F.3d at 74); Def. Br. (Dkt. No. 25) at 15 (quoting Meyer, 868 F.3d at 74 for the same proposition)), it is not necessary for this Court to engage in a choice of law analysis. Schnabel v. Trilegiant Corp., 697 F.3d 110, 119 (2d Cir. 2012) (where different states "apply substantially similar rules," "[w]hich state's law applies is . . . without significance"); Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004) ("In the absence of substantive difference [between the laws of different jurisdictions], a New York court will

dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.").

B.   **Whether the Parties Entered into An Agreement to Arbitrate**

Defendant argues that Plaintiff "agreed to arbitrate with Bespoke," because "[t]he process by which Garcia created an account with Bespoke . . . put her on 'inquiry notice' of the Bespoke Post Terms."  (Def. Br. (Dkt. No. 25) at 16)

Plaintiff responds that "no valid agreement [to arbitrate] was ever formed due to lack of inquiry notice."  (Pltf. Opp. (Dkt. No. 27) at 14, 20-28)

In New York and California "[i]t is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" Starke v. SquareTrade, Inc., 913 F.3d 279, 288 (2d Cir. 2019) (citing Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp., 93 N.Y.2d 584, 589 (1999)); see Edmundson v. Klarna, Inc., 85 F.4th 695, 703 (2d Cir. 2023) (applying mutual assent principle "with equal force to contracts formed online"); Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175 (9th Cir. 2014) (noting that "[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract" under California law) (internal citation and quotation marks omitted).

"[W]here there is no evidence that an internet . . . user had actual knowledge of the contractual terms," she is nevertheless "bound [by those contractual terms] if (1) a 'reasonably prudent person would be on inquiry notice' of the terms, and (2) the user unambiguously manifests assent 'through . . . conduct that a reasonable person would understand to constitute assent.'"  Edmundson, 85 F.4th at 703 (quoting first Soliman v. Subway Franchisee Advert. Fund Tr., Ltd., 999 F.3d 828, 834 (2d Cir. 2021), and then quoting Schnabel, 697 F.3d at 120).

9

1. **Inquiry Notice**

In moving to compel arbitration, Defendant argues that "[b]oth of the two invitations to Plaintiff [] to review and assent to [the Terms of Use] on Bespoke['s] website" put Plaintiff on inquiry notice of the arbitration provision. (Def. Br. (Dkt. No. 25) at 19; see id. at 16-27)

Plaintiff counters that she was not put on "inquiry notice," because the Terms of Use were not provided in a "reasonably conspicuous" manner. (Pltf. Opp. (Dkt. No. 27) at 20-26)

In the context of alleged web-based contracts, whether a consumer was put on inquiry notice "often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way." Starke, 913 F.3d at 288. Courts "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in way that would put her on inquiry notice of such terms." Id. at 289. The Second Circuit has instructed district courts to consider the following factors in making this determination: (1) whether the contract terms "are linked on an uncluttered interface" or "linked in obscure sections of a webpage that users are unlikely to see," Edmundson, 85 F.4th at 704 (internal citations and quotation marks omitted); (2) whether the contract terms are "temporally and spatially coupled" with "the mechanism for manifesting assent," for example, a check box or a "Create Account" button, id.; (3) whether the "entire screen" with the hyperlink to the Terms of Use "is visible at once," such that "the user does not need to scroll beyond what is immediately visible to find the Terms of [Use]," Meyer, 868 F.3d at 78; and (4) whether the parties were dealing in a "transactional context" that "contemplated some sort of continuing relationship . . . that would require some terms and conditions." Id. at 80.

Here, Bespoke's user registration process provided two opportunities to review the Terms of Use. The first reference appears on the registration screen, where the user is told that "[b]y creating an account," he or she "agree[s] to the **Terms of Use** and **Privacy Policy**." (Lamberton Decl. (Dkt. No. 26) ¶ 9) (emphasis in original)  A hyperlink in the text referring to the Terms of Use directs the user to the Terms of Use. The second reference appears on the payment screen, in text reading "See full terms here," which is also hyperlinked to the Terms of Use. (Id. ¶ 12)

The first "Terms of Use" hyperlink is in bold blue lettering against a white background, as one of three links on the page, and placed below the only button on the screen. Meyer, 868 F.3d at 77-78 (describing a similar screen as "uncluttered"; noting that a "reasonably prudent smartphone user knows that text that is highlighted in blue . . . is hyperlinked to another webpage where additional information will be found"); Feld v. Postmates, Inc., 442 F. Supp. 3d 825, 832 (S.D.N.Y. 2020) (finding notice of terms to be "reasonably conspicuous" where "[t]he Terms of Service and Privacy Policy terms appear in blue type that contrasts with the sign-up page background, indicating that they are hyperlinks; the remainder of the text is black").

As to temporal coupling, the language "[b]y creating an account you agree to the **Terms of Use**" (Lamberton Decl. (Dkt. No. 26) ¶ 9) (emphasis in original), is "a clear prompt directing users to read the [Terms of Use] and signaling that their acceptance of the benefit of registration would be subject to contractual terms." Meyer, 868 F.3d at 79 (applying same reasoning to similar language).  A reasonably prudent internet user would thus expect the Terms of Use to be "coupled with signing up for [Bespoke's] service." Feld, 442 F. Supp. 3d at 832 (noting that the "Terms of Service" "appear[] at the time a user is creating an account").

11

As to spatial coupling, the hyperlink to the Terms of Use is below the "Create Account" button, which a user must click to complete the registration process. The hyperlink is not obscured by other visual elements. See Meyer, 868 F.3d at 78 (noting that hyperlink to terms of service "appears directly below the buttons for registration").

The Court concludes that Bespoke's registration screen put Plaintiff on inquiry notice that by registering, she was agreeing to the Terms of Use.

In arguing that the registration screen did not put her on inquiry notice of the Terms of Use, Plaintiff contends that the hyperlink to the "Terms of Use" (1) is spatially "separated" from the "Create Account" "button" "by a line of unrelated text" asking users whether they "[a]lready have an account"; and (2) "appears in extremely small print" compared to larger font used in surrounding text. (Pltf. Opp. (Dkt. No. 27) at 25)

Contrary to Plaintiff's argument, however, the "Terms of Use" hyperlink is located in close proximity to the button, on a single screen that can be viewed in its entirety without scrolling. See Meyer, 868 F.3d at 78-79 (noting that "the user does not need to scroll beyond what is immediately visible to find notice of the Terms of [Use]"). Moreover, the hyperlink is "set apart from surrounding information" on the screen by being "in a color that stands in sharp contrast to the color of the interface['s] background." Edmundson, 85 F.4th at 706. Where a hyperlink "appears sufficiently 'conspicuous in light of the whole interface,'" courts have found that it is reasonably conspicuous even if "the hyperlinks to [the] terms [of service] are in a smaller font relative to other text" on the screen. Id. (quoting Nicosia, 834 F.3d at 237). In sum, a reasonable person would know that, by creating an account, she was agreeing to Bespoke's Terms of Use.

Bespoke's Terms of Use are also hyperlinked on the payment page, in association with the phrase "See full terms here." (Lamberton Decl. (Dkt. No. 26) ¶ 12)  When Plaintiff purchased Bespoke's monthly subscription service, she checked a box to indicate that she accepted Bespoke's Terms of Use, "affirmatively assent[ing] to the terms of the agreement." Porcelli v. JetSmarter, Inc., No. 19 Civ. 2537 (PAE), 2019 WL 2371896, at *4 (S.D.N.Y. June 5, 2019) (citing Meyer, 868 F.3d at 75); see Schnabel, 697 F.3d at 127 (noting that "the presentation of [the] terms [of service] at . . . purchase or enrollment . . . indicates to the consumer that he or she is taking such goods or employing such services subject to additional terms and conditions that may one day affect him or her"); Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 397 (E.D.N.Y. 2015) (noting that almost every district court to consider the issue "has found 'clickwrap' licenses, in which an online user clicks 'I agree' to standard form terms, enforceable").

In arguing that the hyperlink on the payment screen did not put her on inquiry notice, Plaintiff contends that the hyperlink is "unrecognizable as a hyperlink," because it is in black lettering and "devoid of any emphasis such as bolding, italicization, . . . and other offsetting features."  (Pltf. Opp. (Dkt. No. 27) at 27)  The issue of inquiry notice does not turn entirely on whether the text at issue is of a certain color or font, however.  Edmundson, 85 F.4th at 706-07 (finding hyperlinks in "black text on a white background" as "sufficiently conspicuous").  Here, the phrase "See full terms here." is in black text on a white background; it is printed in the same font as neighboring text; it appears at the end of a short three-sentence paragraph; and it is located immediately above the check off box saying, "**I agree – Let's do this.**"

Plaintiff also argues that the language on the payment page does not "'clearly signal[]'" to the user "what [she] is agreeing to do." (Pltf. Opp. (Dkt. No. 27) at 26) (quoting Soliman v. Subway Franchisee Advert. Fund Tr., Ltd., 999 F.3d 828, 837 (2d Cir. 2021)). In Soliman, Subway published a one-page print advertisement inviting consumers to text a keyword to receive "weekly offers" from Subway. See Soliman, 999 F.3d at 832. The advertisement contained (1) two paragraphs in large font, explaining the text-based promotion; and (2) a fine-print paragraph at the bottom of the page, stating "Terms and conditions at subway.com/subwayroot/TermsOfUse.aspx." Id. The court found that the "vague[]" reference to the URL was "buried within a fine-print paragraph with over eighty other words," and did not clearly inform users that, "by texting the keyword to Subway, they are agreeing to any terms and conditions on the Subway website." Id. at 830-31, 835, 838. The court further noted that a user seeking to access the Subway terms of use would have to "type in a thirty-seven-character URL to their cellphone or computer," which is much "more difficult [than] navigat[ing] to the terms of use" through a hyperlink on a webpage. Id. at 839. For all these reasons, the Second Circuit concluded that the reference to the terms and conditions was "not reasonably conspicuous." Id. at 840.

The Bespoke payment page is not comparable to the advertisement in Soliman. As an initial matter, there is nothing vague about the "See full terms here" notice. (Lamberton Decl. (Dkt. No. 26) ¶ 12); see Bolling v. Bobs Disc. Furniture, LLC, No. 22 Civ. 6312 (LDH) (JMW), 2024 WL 1327357, at *2 (E.D.N.Y. Mar. 27, 2024) (finding that the language "See Terms & Conditions" provided "sufficient notice of the arbitration clause"). The notice is also not "buried within a fine-print paragraph with over eighty other words." Soliman, 999 F.3d at 835. Instead, the phrase is in the same font as neighboring text and is at the end of a short

paragraph with half as many words. The user was also not required to type in a thirty-seven character URL; instead, the terms of use could be accessed merely by clicking on the hyperlink. Finally, directly beneath the hyperlink to the Terms of Use is a large check box stating, "I agree – Let's do this," which "signal[s] to users that they will be agreeing to [Bespoke's] terms through their conduct." Edmundson, 85 F.4th at 707.

Plaintiff argues, however, that she "believed" that she had "enroll[ed] in a free trial subscription" that "would automatically terminate at the conclusion of the trial period." (Pltf. Opp. (Dkt. No. 27) at 22) Given this belief, Plaintiff was "less likely to take notice of [the Terms of Use] in the context of [what she believed was] a one-off transaction." (Id. at 23)

Whether a notice is reasonably conspicuous is analyzed under an objective standard, however, and thus the issue does not turn on Plaintiff's alleged subjective belief that she had merely registered for a free trial. See Schnabel, 697 F.3d at 124 ("[T]he touchstone of the [inquiry notice] analysis is whether reasonable people in the position of the parties would have known about the terms and the conduct that would be required to assent to them."). Bespoke's registration and payment process provided clear notice to a reasonable user that she was entering into a continuing relationship with Bespoke. (Lamberton Decl. (Dkt. No. 26) ¶ 12 (payment screen telling users that "your membership continues until you cancel"); id. (payment screen stating that "[e]ach month, we'll select a new box for you based on your interests")) As discussed above, a reasonable user would be on notice that Bespoke's "terms [of use] governed that [forward-looking] relationship," Meyer, 868 F.3d at 80, whether or not she chose to read the Terms of Use. See id. at 79 ("While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice.").

15

The Court concludes that the hyperlinks to Bespoke's Terms of Use were reasonably conspicuous, and signaled to users that – by purchasing the subscription service – they would be subject to certain Terms of Use.

### 2.     Manifestation of Assent

Plaintiff unambiguously manifested assent to Bespoke's terms on August 24, 2019, when she checked the box for "I agree – Let's do this," and clicked on the "Join the Club" button to finalize her purchase of the subscription service.  (Lamberton Decl. (Dkt. No. 26) ¶ 12); see Edmundson, 85 F.4th at 707-08 (finding that user "assent[ed] to arbitration" when she selected "Confirm and continue" to finalize her purchase of defendant's product); Meyer, 868 F.3d at 75 (noting that "an 'electronic click can suffice to signify the acceptance of a contract'") (quoting Sgouros v. TransUnion Corp., 817 F.3d 1029, 1033-34 (7th Cir. 2016)).

As discussed above, the hyperlinked text on Bespoke's registration and payment webpages put reasonable users on inquiry notice of Bespoke's Terms of Use.  Moreover, the hyperlinked text "See full terms here" on Bespoke's payment webpage is located immediately above the "I agree" check box and the "Join the Club" button.  See Meyer, 868 F.3d at 80 ("The fact that clicking the register button had two functions – creation of a user account and assent to the Terms of Service – does not render [the user's] assent ambiguous.").  Moreover, the payment page is the last step in Bespoke's three-step subscription process, and provides the second notice of Bespoke's Terms of Use.  See Salameno v. Gogo Inc., No. 16-CV-0487 (JBW), 2016 WL 4005783, at *4 (E.D.N.Y. July 25, 2016) (noting that courts enforce website agreements "'where notice of the hyperlinked terms and conditions is present on multiple successive webpages of the site'") (quoting Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 401 (E.D.N.Y. 2015)).

Because Bespoke provided reasonably conspicuous notice of its Terms of Use, and because Plaintiff unambiguously manifested assent to those terms, she is bound by the arbitration clause contained in the Terms of Use.

### C.    Scope of the Arbitration Agreement

Bespoke's arbitration clause provides as follows:

> Any and all controversies, disputes, demands, counts, claims, or causes of action (including the interpretation and scope of this clause, and the arbitrability of the controversy, dispute, demand, count, claim, or cause of action) between you and us or our employees, agents, successors, or assigns, will exclusively be settled through binding and confidential arbitration.

(Lamberton Decl., Ex. C (Dkt. No. 26-3) at 14)

This language is similar to "the paradigm of a broad clause" that reflects an intent to refer all disputes to arbitration. Collins & Aikman Prod. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 20 (2d Cir. 1995). Disputes arising under such broad arbitration provisions are "presumptively arbitrable." Id. (citing Prudential Lines, Inc. v. Exxon Corp., 704 F.2d 59, 63 (2d Cir. 1983)); see also Holick v. Cellular Sales of N.Y., LLC, 802 F.3d 391, 394 (2d Cir. 2015) ("[T]he arbitration clause at issue here is broad because it applies to '[a]ll claims, disputes, or controversies arising out of, or in relation to this document.'"); Shaw Grp. Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 120, 125 (2d Cir. 2003) (finding claim subject to arbitration where agreement contained clause stating that "[a]ll disputes between you and us concerning or arising out of this Agreement shall be referred to arbitration").

Plaintiff complains that Bespoke's arbitration provision is "infinite" in its scope, and untethered to Bespoke's Terms of Use. (Pltf. Opp. (Dkt. No. 27) at 29-30) (quoting McFarlane v. Altice USA, Inc., 524 F. Supp. 3d 264, 275 (S.D.N.Y. 2021))  According to Plaintiff, it would be "unconscionable" to enforce such an "infinite" arbitration clause. (Id. at 31-32)

But Plaintiff's dispute with Bespoke arises out of Bespoke's automatic renewal of subscriptions (see Am. Cmplt. (Dkt. No. 17) ¶ 1) (alleging that Defendant "engag[ed] in an illegal 'automatic renewal' scheme"), a subject that falls within the scope of Bespoke's Terms of Use.  Moreover, Plaintiff cites no case law suggesting that parties may not freely contract that all disputes arising out of their relationship will be submitted to arbitration.  And the Second Circuit has instructed that "when the parties have contracted to submit the question of the arbitrability of a dispute to arbitrators, courts must respect and enforce that contractual choice." Metro. Life Ins. Co. v. Bucsek, 919 F.3d 184, 190 (2d Cir. 2019); see also CompuCredit Corp. v. Greenwood, 565 U.S. 95, 98 (2012) ("[The FAA] requires courts to enforce agreements to arbitrate according to their terms."); Boss Worldwide LLC v. Crabill, No. 19 Civ. 2363 (VB), 2020 WL 1243805, at *3 (S.D.N.Y. Mar. 16, 2020) ("[I]f the arbitration clause is broad, 'it is presumptively applicable to disputes involving matters going beyond the interpretation or enforcement of particular provisions of the contract which contains the arbitration clause.'") (quoting JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 172 (2d Cir. 2004)).

The Court concludes that Bespoke's arbitration clause governs Plaintiff's claims.

**CONCLUSION**

Defendant's motion to compel arbitration (Dkt. No. 24) is granted. This action is stayed pending the outcome of arbitration proceedings.[3]

The parties shall submit a joint letter by **July 24, 2024,** and every 90 days thereafter, updating the Court concerning the status of the arbitration proceedings.

The Clerk of Court is directed to terminate the motion (Dkt. No. 24).

Dated: New York, New York
       April 24, 2024

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

---

[3] Defendant asks this Court to stay this action pending arbitration. (Def. Br. (Dkt. No. 25) at 28) The FAA "requires a stay of proceedings when all claims are referred to arbitration and a stay is requested." Katz v. Cellco Partnership, 794 F.3d 341, 343 (2d Cir. 2015).